M. V. HENDERSON, JR., Superintendent of Banking, Appellee, v. FARMERS SAVINGS BANK OF HARPER, Appellee, et al., Interveners, Appellants.

**BANKS AND BANKING:** Certificates of Deposit—Illegal Issuance.
1  Certificates of deposit issued by a savings bank in payment or exchange for promissory notes, when the payee of the certificates knew that the bank *had no money with which to buy said notes,* are absolutely void in the hands of *any* holder. Especially is this true when the directors had not authorized the issuance.

**BILLS AND NOTES:** Negotiability—Payment in Current Funds. A
2  promissory note which is otherwise negotiable is not rendered nonnegotiable by a provision requiring payment in ''current funds.''

**EVIDENCE:** Parol As Affecting Writings—Certificate of Deposit.
3  Parol evidence is admissible to show that a certificate of deposit does not represent money actually deposited in the issuing bank, but does represent a loan.

**BILLS AND NOTES:** Delivery—Conclusive Presumption. A conclusive
4  presumption of delivery exists as to a negotiable promissory note in the hands of a holder in due course.

**BANKS AND BANKING:** Certificates of Deposit—Illegal Issuance for
5  Notes—Tender. The receiver of an insolvent bank may contest the validity of certificates of deposit without tendering to the holders the promissory notes illegally obtained by the issuance of such certificates.

**BANKS AND BANKING:** Unlawful Acts—Estoppel. The receiver of 6 an insolvent bank may not be estopped to plead an absolutely void act on the part of the bank officials.

Headnote 1:  7 C. J. p. 853.  Headnote 2:  8 C. J. p. 131.  Headnote 3:  22 C. J. p. 1259.  Headnote 4:  8 C. J. p. 1001.  Headnote 5:  7 C. J. p. 879 (1926 Anno.)  Headnote 6: 21 C. J. p. 1200.

*Appeal from Keokuk District Court.*—CHARLES A. DEWEY, Judge.

FEBRUARY 17, 1925.

INTERVENTIONS to have claims allowed as deposits, against receiver of a defunct bank. Petitions were dismissed, and claimants appeal.—*Affirmed.*

*H. M. Bartlett, J. F. Devitt, Hugo F. Goeldner, C. J. Lambert, F. L. Goeldner, Albert Huber, E. C. Eicher,* and *W. M. Keeley,* for appellants.

*Hamilton & Updegraff,* for receiver, J. M. White.

*Thompson, Loth & Lowe, Amici Curiae.*

ARTHUR, J.—I. The Farmers Savings Bank of Harper, Iowa, was a small bank, having a capital stock of $15,000. At the time of the transactions involved, R. F. Palmer was cashier of the bank. Palmer, cashier, was intrusted by the board of directors with full management of the bank. In June, 1920, one H. C. Staggs, accompanied by W. F. Wilson, entered the bank, and represented to Palmer that they were selling stock in the Mid-Continent Gas & Oil Refining Company, which had its principal place of business in the town of Washington, Iowa. Palmer knew Wilson as a former banker in Washington, Iowa. Wilson introduced Staggs as the chief salesman of the company, and told Palmer that anything Staggs said could be relied upon. Staggs and Wilson had with them notes of one Frank Olinger for $3,000, which Olinger had executed for the purchase of oil stock in the company which they represented,

1. BANKS AND BANKING: certificates of deposit: illegal issuance.

and wanted to sell the notes to the bank. Palmer told them that the bank had no money with which to purchase the notes, and would not be interested. Thereupon, Staggs and Wilson said that they would take a certificate of deposit in exchange for the notes, running the same length of time as the notes. They finally succeeded in interesting Palmer, who drove out to Olinger's farm and talked with him, came back, and bought the Olinger notes, issuing a certificate of deposit in payment therefor. A few days later, Staggs and Wilson came to the bank again, and brought more notes, and asked Palmer to handle them. At this time they told Palmer more about their company and its holdings. They said they had a good company, legitimately organized; that the company had in its possession, either by ownership or lease, around a million acres of land, located in several states; that it had several flowing wells, and they were paying stockholders 2 per cent a month; that Frank Thompson, president of the company, was a millionaire. They mentioned several prominent men in Washington, Iowa, who they said were connected with and backing the company, whom Palmer personally knew, and knew they were good financially. They said they were going to make the Harper bank a depository for their business, if Palmer would handle these notes for them. In substance, the proposition they made to Palmer was that they would sell the notes which they took for the purchase of oil stock to the bank, and take the certificates of deposit in exchange for the notes running the same length of time as the notes for which they were given; and if the notes were not paid, they, Wilson and Staggs, would pay the money into the bank to take care of the certificates of deposit; that the certificates of deposit issued for the purchase of the notes were never to be paid by the bank unless the notes were paid; that funds of the bank were not to be used to take up any of the certificates of deposit. Under this arrangement, about $75,000 in notes were purchased by the bank, and certificates of deposit issued in payment therefor, nearly $50,000 of which are represented by certificates of deposit claimed upon by interveners in this proceeding. The notes were all given for oil stock by parties in the vicinity of Harper. The notes bore 7 and 8 per cent interest, and the certificates, 4 per cent. The notes were made to Staggs

and Wilson, and indorsed by them to the bank. The record does not disclose, as to all of the transactions, what particular certificate was issued in exchange for the several notes purchased. But little attempt was made to connect the certificates with any particular note. The record is clear that no money was used in the purchase of the notes. The bank had no money with which to purchase the notes. Certificates of deposit were issued simply in exchange for the notes.

Some claim is made by appellant that the bank received large benefit from the notes for which the certificates were given in exchange. The record does not support this contention. Only about $800 principal has been collected on the notes, and about $100 interest. The bank sold quite a large amount of notes to the Commercial Savings Bank of Des Moines, during the last two or three years that it operated. But it is clear in the record that none of these notes were so-called "oil notes" which the bank received from Staggs and Wilson. The bank did put up with the Des Moines bank some of the oil notes as collateral to the bank's note or notes given to the Des Moines bank for a loan, but nothing has been collected upon said notes so pledged as security. It seems that Thompson deposited with the bank as collateral a certain certificate of deposit on a Michigan bank for $3,250, which certificate has been collected by the bank or the receiver. But as we understand the record, the Thompson note was his individual note, and not one of the oil notes purchased by the bank. The notes are now in the hands of the receiver, or under his control, and the receiver has asked for and has been given authority to proceed in the collection of them. The bank failed; and on March 16, 1921, on petition of Henderson, superintendent of banking, J. M. White was appointed receiver. Pursuant to a notice given to the creditors, claims were filed with the receiver. On December 3, 1921, the receiver filed in the district court a report showing claims in the aggregate of $135,421.29, and classification of said claims under Schedules A, B, and C. Claims under Schedule C were based on deposits of money in the bank, and allowance thereof recommended by the receiver as depositors' claims, based upon what purported to be time certificates of deposit. These claims in Schedule C were disallowed by the receiver, the receiver stating

,in his report that none of said alleged certificates were issued for money deposits in the bank, and that no money came into said bank on account of the issuance of any of said certificates set forth in said schedule. The receiver further stated that said certificates were issued in exchange for promissory notes, which were and are of no value, and that said certificates were not for deposits, but were evidences of loans to the bank for a specified period, and that none of said certificates listed in Schedule C represented bona-fide deposits of money in the bank, and should not be allowed as depositors' claims; and asked that the court determine whether or not said claims should be allowed, and what classification should be given them. Schedule C included all the claims involved in this appeal.

By a supplemental report of March 13, 1922, the receiver stated that he had "not allowed" the claims set forth in Schedule C, giving as his reasons therefor that said claims were based upon certificates of deposit issued by said bank in exchange for the purchase of promissory notes given by various persons for the purchase price of oil stock, which notes were procured by fraud, and which said notes were sold to the bank by means of fraud practiced upon said bank; and asked the court to disallow said claims. By proper order, the court fixed a time and place of hearing, and prescribed notice to be given to creditors, which notice was given by the receiver, bringing said report on for hearing on the 10th of April, 1922. Claimants in these cases appeared and filed objections to report of the receiver, and also filed petitions of intervention, based upon the claims so filed. The issues formed by the several petitions of intervention were tried in equity. The court dismissed said petitions of intervention. From such judgment this appeal is taken. By order of this court, the appeals of the several interveners were consolidated, and the briefs and arguments of counsel were prepared in harmony with said order, and cover the issues common to said appeals and the principal questions involved, with special consideration, in certain of the appeals, of points especially relating to such appeals or issues therein. It is unnecessary to set forth here amounts of individual claims of the several interveners.

II. Interveners, appellants, urge that the court erred in

failing to establish and allow their claims as depositors' claims, entitled to share in distribution of assets of the bank with other depositors, and entitled to preference in distribution of assets of the bank, under Section 1877 of the Code of 1897.

The main issues presented on this appeal are: Were the transactions involved in the issuing of the certificates now held by interveners, deposits, so as to bring the claims within the provisions of Code Section 1877, giving preference to depositors; or were said transactions, in legal effect, loans, by which the bank carried an indebtedness which is prohibited by statute? There are other propositions presented in the cases, such as: (1) Were the certificates nonnegotiable, by reason of the use of the words "in current funds?" (2) Were they procured by fraud? (3) Were they without consideration? (4) Is the bank estopped from denying the legality of said certificates?

III.  We may here dispose of the question of the negotiability of the certificates of deposit claimed on because, by their terms, payable in "current funds." That question has been finally settled in the very recent case of *Feder*

2. BILLS AND NOTES: negotiability: payment in current funds.

*v. Elliott*, 198 Iowa 447, in which we said:

"The phrase 'current funds,' as used in the certificates of deposit in suit, is the equivalent of 'current money,' as used in the Negotiable Instrument Act. Both expressions mean whatever is receivable and current by law as money. The legislature, by the passage of the Negotiable Instrument Act, has expressly provided that the negotiable character of an instrument is not affected by the fact that it designates a particular kind of current money in which payment is to be made. Under the terms of the statute, instruments otherwise negotiable are not rendered nonnegotiable because made payable in current funds."

IV.  Evidence was introduced to show the true nature of the transactions. This was permissible. *State ex rel. Carroll v. Corning State Sav. Bank*, 136 Iowa 79. What actually occurred when the notes were obtained by the bank and

3. EVIDENCE: parol as affecting writings: certificate of deposit.

the certificates of deposit issued, is without dispute. No cash was paid for the notes. Certificates of deposit were given in exchange for

the notes. The certificates were payable, not on demand, but at future dates, stated in the certificates. The notes or the amounts thereof were not placed as deposits to the credit of anyone. They were listed on the note register of the bank as general assets of the bank. It is without dispute that Palmer, cashier, issued the certificates in the purchase of the notes without authority of the board of directors. From the facts disclosed in evidence, it is clear that the bank did not receive the notes as deposits, and did not treat them as deposits. It was not a transaction where the bank purchased the notes and delivered to the sellers of the notes money, and then the sellers passed the money back to the cashier as deposits. The bank had no money to pay for the notes, and used no money. The cashier attempted to incur indebtedness with which to purchase the notes. In effect, the sellers of the notes extended to the bank credit with which to purchase the notes, and thereby, in effect, made loans to the bank with which to purchase their notes; and the certificates of deposit issued were evidences of such loans. No deposits were made and recorded in the bank corresponding to the certificates of deposit issued. The case of *State ex rel. Carroll v. Corning State Sav. Bank,* supra, analyzes and defines the distinction between a deposit and a loan. Involved in that case was the winding up of the affairs of the Corning State Savings Bank in receivership, under a statute similar to our present statute. The Des Moines National Bank, intervener, claimed on what purported to be two certificates of deposit in the sum of $5,000 each, issued by the failed bank. The receiver pleaded that intervener, the Des Moines National Bank, was not a depositor; that no money was ever received from the intervener by virtue of said certificates; and that whatever money the Corning Bank did receive was, in fact, a loan, prohibited by the laws of the state. The trial court dismissed both claims. On appeal, the questions before us for review were: (1) Was the Des Moines National Bank a depositor in the Corning State Savings Bank? (2) If not a depositor, was it entitled to have its claim established as a loan? (3) If the transaction were a loan, was it illegal, and if so, will this illegality defeat its claim?

The two pieces of paper were identical in form. The transaction with respect to one certificate was that intervener bank

wrote the savings bank, in substance, that it would be pleased to place with the savings bank $5,000 for 6 months at 6 per cent interest, and asked if it could use the same. The savings bank responded, through its cashier, that it could use the money on a straight time certificate for one year at 6 per cent. Thereupon, the Des Moines bank sent a draft payable to the savings bank for $5,000, with request for a certificate. With respect to the other transaction, it appears, in substance, that the savings bank had become hard-up, and needed more money, and sent a messenger to the Des Moines bank with such message. The intervener bank wrote the Corning bank a letter, offering to deposit more money; at the same time refusing to make a loan. In response to this letter, the Corning bank wrote a letter, sending a certificate of deposit for $5,000, asking the Des Moines bank to place it to the credit of the Corning bank. The Des Moines bank gave the Corning bank credit for the amount of the certificate issued. With respect to these two transactions, we said:

"From this recital of the facts it is apparent, we think, that the first transaction was in fact and form a deposit; and it is just as clear that the second transaction both in form and fact was a loan."

We further said:

"The issuance of a certificate of deposit does not, in and of itself, indicate the true nature of the transaction. Such an instrument may be issued, although a loan was intended, and parol evidence is admissible to show the true nature of the transaction. * * * A certificate of deposit is, for many purposes, treated as a promissory note; and parol evidence to show that it was given as evidence of a loan is admissible. * * * Our holding is that the nature of the transaction for which it was given,— that is, as to whether it was a loan or a deposit of money,— may be shown by proper parol evidence."

Holding to the same effect, see *State ex rel. Carroll v. Corning Sav. Bank*, 139 Iowa 338.

In the case before us, we think the conclusion is inescapable that the certificates represented loans, and not deposits. Our holding being that the certificates claimed on by interveners represented loans or credit extended to the bank, and not de-

posits, the claims of interveners based on said certificates are not entitled to allowance under the provisions of Section 1877, Code of 1897, giving preference to deposits. The court was right in refusing allowance of the claims of interveners as claims having a preference under Section 1877 of the Code of 1897. The holding at this point would be decisive of the whole case, and render consideration of other questions presented in the case unnecessary, but for the further holding of the lower court that the claims of interveners based upon the certificates should not be allowed as claims of any kind or class. The lower court held that the certificates were void and unenforcible in the hands of interveners against the estate in the hands of the receiver for any purpose, even assuming that interveners were bona-fide purchasers of the certificates in due course.

V. We come now to the proposition: The certificates having been given as evidences of indebtedness representing loans or credit extended to the bank, are they enforcible; or are they void and nonenforcible in the hands of the present holders against the estate in the hands of the receiver,—assuming, without passing thereon, that interveners were innocent purchasers in due course?

A savings bank is a creature of law, the same as any other corporation, and can exercise no power not conferred by law. It derives its authority from the statutes creating and governing it; and an act done in an attempt to exercise power not given it by statute is a void act. *McPherson v. Foster Bros.*, 43 Iowa 48; *Lucas v. White Line Transfer Co.*, 70 Iowa 541. Authority of a savings bank to invest its funds is found in Section 1850, Code of 1897, as amended, which reads:

"Section 1850. Each savings bank shall invest its funds or capital, all moneys deposited therein and all its gains and profits, only as follows:

"(1)   In bonds or interest-bearing notes or certificates of the United States;

"(2)   In bonds or evidences of debt of this state, bearing interest;

"(3)   In bonds or warrants of any city * * *;

"(4)   In notes or bonds secured by mortgage * * *;

"(5)   It may discount, purchase, sell and make loans upon

commercial paper, notes, bills of exchange, drafts, * * *.''

The thirty-fifth general assembly (Chapter 152), in an act conferring certain powers upon trust companies and state and savings banks to act in fiduciary capacity, such as assignee or trustee, guardian, administrator, etc., and to act as a depository of funds of trustees, executors, guardians, etc., also included in the act a subdivision reading: ''* * * state and savings banks * * * shall have power * * *: ''7. To issue drafts upon depositories, and to purchase, invest in, and sell promissory notes, bills of exchange, bonds and mortgages and other securities.''

By the above quoted statutory provisions, a savings bank unquestionably has power to buy notes with its funds. This bank had no funds with which to purchase notes. The question is, in the instant case, concerning the power of the bank to contract an indebtedness for the purpose of purchasing the notes. The power of a savings bank to contract indebtedness is provided in Section 1855-a, Code Supplement, 1913, and appears in Section 9222, Code of 1924, and reads:

''State and savings banks may contract indebtedness or liability for the following purposes only: for necessary expenses in managing and transacting their business, for deposits, and to pay depositors; provided that, in pursuance to an order of the board of directors previously adopted, other liabilities not in excess of amount equal to the capital stock may be incurred.''

It will be observed that, by the statute, savings banks are limited in contracting indebtedness or liability, except by resolution of the board previously adopted, for the following purposes only: (1) For necessary expenses in managing and transacting their business; (2) for deposits; (3) to pay depositors. The indebtedness evidenced by the certificates here involved was not contracted for any of the purposes enumerated and permitted by the statute, but was for a purpose other than that permitted by the limitations of the statute, to wit, for the purchase of notes. It further appears that there was no ''order of the board of directors previously adopted,'' authorizing the cashier to contract the indebtedness evidenced by the certificates. Under the statutory provisions above quoted, a savings bank

may invest in, buy, and sell promissory notes, purchase and make loans upon commercial paper, etc. Also, a savings bank is possessed of such powers as are incident to those enumerated and customarily exercised by banks in carrying out such powers. Authorities need not be cited on this proposition. But this incidental power to transact business does not warrant a cashier of a savings bank, especially without authority of the board of directors and without funds available, to contract debt for the purchase of notes. In *Urbinga v. Farmers' Sav. Bank,* 108 Iowa 221, the bank had agreed in writing to purchase certain notes, and refused to carry out the contract. Suit was brought to enforce the contract. The bank pleaded that it was disqualified by law from assuming such an obligation, and urged that the contract created a debt prohibited by statute. We held, under the statutory provision authorizing a savings bank to " 'discount, purchase, sell and make loans upon commercial paper, notes, bills of exchange, drafts,' " etc., that the bank had the right to make the contract for the purchase of the notes. We said:

"We are clearly of the opinion that the statute authorizing the purchase of notes gives the right to make the contract in question."

However, in the *Urbinga* case there was no contention that the bank did not have funds with which to purchase the notes. In the instant case, the bank had no funds with which to purchase the notes; and that situation was clearly understood and agreed to by the parties at the time the notes were sold to the bank and the certificates of deposit issued. It was specifically understood and agreed between the cashier and the payees and indorsers of the notes, who became the payees in the certificates, that there were no funds in the bank with which to pay the certificates, and that no funds of the bank were ever to be used in payment of the certificates. Reading Sections 1850 and 1855-a together, we discover no authority, express or implied, permitting a savings bank to become indebted for the purchase of notes, as the bank did in the instant case. This question, in principle, was before us in *State ex rel. Carroll v. Corning State Sav. Bank,* 136 Iowa 79; *State ex rel. Carroll v. Corning Sav. Bank,* 139 Iowa 338. In *State v. Corning State Sav. Bank,* 136

Iowa 79, where it was held, as to the second transaction there involved, that the relation was that of borrower and lender, and that the transaction was illegal, and that the doctrine of waiver and estoppel did not apply to such contracts,—said contracts being like those here involved,—we said:

"This statute [Section 1855, which was the same as our present Section 1855-a, Code Supplement, 1913, except that it did not contain the provision for incurring other liabilities on order of the board of directors, previously adopted] was evidently for the benefit of those who cared to make deposits of their savings, and to prevent banks chartered for that purpose from engaging in a general banking business, with all its incidents and hazards; and the legislature saw fit to prohibit such banks from engaging in certain forms of business. This was for the benefit of the customers, depositors, and creditors of the bank; and, when such a bank becomes insolvent, those creditors whose loans are prohibited should not be allowed to share with other lawful creditors."

See cases cited.

"The statute quoted is an express prohibition of such a transaction as took place between these banks; and of this, intervener bank is conclusively presumed to have had knowledge."

In speaking of estoppel, we said:

"One cannot by plea of estoppel evade the laws of the state and reap the benefits of a prohibited agreement."

In *State ex rel. Carroll v. Corning Sav. Bank,* 139 Iowa 338, where the transaction was similar to that in the instant case, and wherein it was held that the transaction was a loan of the certificates issued, we said: "The certificates were void, and were rightly rejected." In *State ex rel. Carroll v. Corning State Sav. Bank,* 136 Iowa 79, we pointed out the distinction between an ultra vires and a void act. We said:

"If the contract were simply *ultra vires,* the bank, having received the benefits thereof, would be estopped to deny its liability. * * * But, if the contract be one prohibited by law, and therefore unlawful, then no recovery may be had thereon."

It follows that the issuing of certificates of deposit for the purchase of notes, under the circumstances disclosed by the evidence, was more than an ultra vires transaction,—it was a void

transaction; and the defenses of estoppel and waiver and bona-fide holder for value have no application, and are not available to appellants. *Traders Bank of Chicago v. Alsop,* 64 Iowa 97; *In re Assignment of Mutual G. F. Ins. Co.,* 107 Iowa 143; *First Nat. Bank of Marshalltown v. Church Federation of America,* 129 Iowa 268; *State ex rel. Carroll v. Corning State Sav. Bank,* 136 Iowa 79; *State ex rel. Carroll v. Corning Sav. Bank,* 139 Iowa 338; 8 Corpus Juris 768.

According to the great weight of authority, if negotiable paper is issued without authority of law, no action can be maintained thereon for any purpose. *Swanson v. City of Ottumwa,* 131 Iowa 540; *Merrill v. Monticello,* 138 U. S. 673; *Hedges v. Dixon County,* 150 U. S. 182.

VI. In the claim of Emanuel Arnstein, based on four certificates of deposit of $1,000 each, there is a feature different from the claims of the other interveners. The receiver pleaded, in addition to the defenses interposed to all of the certificates in the several cases, that the certificates represented loans, and not deposits, etc., and that these certificates were never actually delivered; and introduced testimony in proof of that allegation. The testimony, in substance, was that the certificates were made out with Staggs as payee, by Palmer, cashier; that the agreement was that Staggs would bring in notes in the amount of $4,000, to exchange for the certificates, and that the certificates would then be delivered; that Staggs never brought in the notes; that, one evening, after the certificates had been written up, Staggs was in the bank, behind the bank counter, visiting with Palmer; that, on the following day, the certificates were missing; that Palmer and his assistant cashier, the only persons who were transacting business for the bank, testified that these certificates were never delivered to Staggs, and that there were no notes in the bank to correspond with these certificates,—that is, no notes for which they were to be given. The contention is that the certificates were taken by Staggs, without permission, at the time he was behind the bank counter; and that they were taken without giving the notes which had been agreed upon in return therefor, and, therefore, without any consideration.

Whether or not the circumstances disclosed in evidence

*4. BILLS AND NOTES: delivery: conclusive presumption.*

would warrant the conclusion that Staggs, without permission, took and carried away the certificates, we think that this does not affect the validity of the certificates in the hands of Arnstein. The whole record shows that all of the certificates, including these certificates, made to both Staggs and Wilson, were issued under the same bargain and agreement; that these certificates were issued under the same agreement and understanding as the certificates held by the other interveners. We think the Arnstein certificates are in the same category as those held by the other interveners. They represented loans, and not deposits, and were issued without authority of law; and no recovery can be had thereon. The certificates were duly issued by the cashier, and were, in form, negotiable instruments. The certificates came into the possession and ownership of Arnstein through several indorsements. We think valid delivery of the certificates is conclusively presumed, under Section 9476, Code of 1924.

VII.   Interveners pleaded and argue that no offer was made to return or tender to any person entitled thereto any of the notes purchased by said bank in the transaction in which the

5. BANKS AND BANKING: certificates of deposit: illegal issuance for notes: tender.

certificates claimed upon were issued, nor to return any part of the value received in said transaction, nor to rescind the original transaction as between the parties thereto; and that the receiver is estopped to deny the validity of said certificates or the obligation to make payment thereof as certificates of deposit.

6. BANKS AND BANKING: unlawful acts: estoppel.

As hereinbefore stated, but a small amount has been realized upon the notes purchased in the transaction of issuing the certificates. In the Corning Savings Bank case, above cited, we said:

"If the contract were simply *ultra vires*, the bank, having received the benefits thereof, would be estopped to deny its liability. * * * But, if the contract be one prohibited by law, and therefore unlawful, then no recovery may be had thereon."

Under the statutes above quoted, and our holding in the cases cited, we must hold that the contracts involved in the instant case were prohibited by law, and therefore void; and, as said in the cases:

"One cannot by plea of estoppel evade the laws of the state and reap the benefits of a prohibited agreement."

Under the record before us, we think the pleas of estoppel not available to interveners.

Some of the notes purchased were placed with the Commercial Savings Bank of Des Moines, as collateral for loans. None of the notes were sold to said bank, and none of the notes hypothecated were collected. The Des Moines bank did not file claim with the receiver. Presumably, nothing was owed to it by the Harper bank, and the receiver would be entitled to the possession of the notes. As before stated, we think turning over the notes to interveners not necessary to maintaining complete defenses against the certificates claimed upon.

However, this holding is not to be construed as confirming title to such notes in the bank or its receiver. Little effort was made in the trial below to connect up or identify the particular note for which a particular certificate was given. Whether the certificate holder is, in equity, entitled to the note for which his certificate was given, is a question which is reserved from this adjudication. The decree here will be without prejudice to the future litigation of that question. To that extent, the decree below will be modified.

The receivership is still pending, and interveners may ask such relief by supplemental pleadings, if they desire to do so.

What we have said is decisive of the case, and the issue of fraud in the inception of the certificates need not be discussed.

Results in affirmance of the decree entered below, as above modified.—*Modified and affirmed.*

FAVILLE, C. J., and EVANS, STEVENS, DE GRAFF, VERMILION, and ALBERT, JJ., concur.