359 So.2d 886 (1978)
FLORIDA BANKERS ASSOCIATION, and Florida National Bank at Lakeland, Petitioners,
v.
LEON COUNTY TEACHERS CREDIT UNION, Pinellas County Teachers Credit Union, Duval County Teachers Credit Union, Publix Employees Credit Union, Florida Credit Union League, Inc., and Karen G. Gerrell, Cross-Petitioners,
v.
DEPARTMENT OF BANKING AND FINANCE, DIVISION OF BANKING, Respondent.
No. HH-333.
District Court of Appeal of Florida, First District.
May 22, 1978.
Rehearing Denied July 11, 1978.
*887 J. Thomas Cardwell, Nicholas Yonclas and Michael P. McMahon of Akerman, Senterfitt & Eidson, Orlando, for petitioners.
F. Perry Odom and Dean Bunch of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, Charles P. Seibold of Bell, Blake & Metzner, and Ralph S. Swoboda, Madison, Wis., for cross-petitioners.
S. Craig Kiser, Tallahassee, for respondent.
SMITH, Judge.
Florida Bankers Association and Florida National Bank at Lakeland, as petitioners, and Leon County Teachers Credit Union, *888 Pinellas County Teachers Credit Union, Duval County Teachers Credit Union, Publix Employees Credit Union, Florida Credit Union League, and an individual member of the Leon County Teachers Credit Union, as cross-petitioners, complain on divergent grounds of an order of the Department of Banking and Finance, entered in formal proceedings pursuant to Section 120.57(1), Florida Statutes (1977). At issue is the lawfulness of "share drafts" by credit union members to effect withdrawals from their credit union accounts. The administrative proceedings were initiated by the four credit unions' petition for a formal hearing under Department rules, following notice from the Department, on November 1, 1976, to discontinue their practice of honoring members' drafts effecting remote withdrawal of their deposits. The Department referred the petition to the Division of Administrative Hearings, Department of Administration, which permitted the commercial banks as intervenors to oppose the credit unions' claim for relief. After a hearing, the hearing officer filed a recommended order containing appropriate findings of fact and conclusions of law, and recommending that the Department sustain the position of the credit unions. The Comptroller, head of the Department, then entered the order which was brought here for review by both the credit unions and the commercial banks. Section 120.68, Florida Statutes (1977).
The Department's order found as a matter of law that credit unions organized and existing under Chapter 657, Florida Statutes (1977), are prohibited by statute from honoring member withdrawal of deposits by drafts placed by payees in the banking collection system. But the Department, by the same order, authorized the four particular credit unions before us, upon appropriate reformation of their bylaws, "to continue their share draft programs as they presently exist as an extension of the experimental status earlier granted." The effect of the order is to permit four credit unions to continue for an indeterminate period the method of operation which the Department conceives is unlawful, and which the credit unions here insist is lawfully incident to their authorized business, absent statutes or Department rules more closely restricting their activities. The commercial banks urge that the Department was correct in holding that statutes forbid credit union share drafting generally, but incorrect in permitting a continuing and temporary but indeterminate violation of the statutes as so interpreted by the Department.
A credit union is a cooperative society organized under supervision of the Department "for the twofold purpose of promoting thrift among its members and creating a source of credit for them at legitimate rates of interest for provident purposes." Section 657.01(1). Section 657.04 explicitly grants certain powers to a duly organized credit union, including power:
(1) To receive the savings of its members either as payment on shares or as deposits... .
.....
(8) To exercise such incidental powers as shall be deemed necessary or requisite to carry on effectively the business for which it is incorporated, pursuant to rules of the department.
Section 659.52(1) of the Florida Banking Code provides that no person other than a bank as defined by that chapter shall "[s]olicit or receive deposits, issue certificates of deposit, with or without provision for interest, make payments on checks,... or transact business in the way or manner of a commercial bank or trust company ..." Yet Section 659.52 also provides:
(2) This subsection shall in nowise restrict or impair any right, authority or power granted savings banks, Morris plan or industrial banks or credit unions organized and operated under the laws of the state.
Chapter 657 and the Department's rules are entirely silent on the question of how credit union members may withdraw their deposited funds. The statutes and rules neither authorize nor prohibit particular methods of withdrawal. The four credit unions before us honor their members' *889 share drafts in the manner described in the recommended order of hearing officer Bentley:
A share draft is payable through a bank and is similar to other forms of payable-through drafts drawn against other nonbank institutions such as money order companies and insurance companies. A member of one of the four Petitioner credit unions who desires to use share drafts must first establish a separate share or deposit account with the credit union. The member contracts with the credit union for participation in the program. All share drafts are paid out of that account. The member receives a book of drafts with the member's name preprinted on each draft. To the layman these drafts look like checks. However, they are not checks. A share draft can be made payable to cash or any payee in any amount, provided the draft does not exceed the available balance in the member's share draft account. A share draft may be presented directly to the credit union by a member to withdraw cash from the member's share draft account, or, a payee who has received a share draft from a member may bring it to the credit union for payment from the member's share draft account. Ordinarily, however, a payee who has received a share draft from a member will deposit the draft in the payee's own bank account. The draft will then be delivered to the credit union's payable through bank through the normal bank clearing channels used also for checks. The information on the draft is extracted by the payable through bank and converted either to an electronic medium or some other form of communication medium which is then used to deliver a request to the credit union for payment of the draft.
The hearing officer found that the power to permit withdrawals is among those "incidental powers" which are reserved to credit unions by Section 657.04(8):
The better interpretation of [Section 657.04(8)] is that credit unions are given the right to exercise such incidental powers, but that exercise may be subjected to regulation by the department... . The department has allowed credit unions to grant withdrawals and to establish many different methods of withdrawal without requiring, and without adopting, any administrative rules on the subject. Thus, absent regulation by the department, credit unions have the power to adopt those methods of withdrawal deemed necessary or requisite to carry on effectively the business for which they are incorporated. The department has no administrative rules pertaining to the methods by which credit unions may allow withdrawals. Therefore, the choice of methods has been left to the credit unions.
... A share draft as utilized by Petitioner credit unions is not a check. While the share draft programs engaged in by the Petitioner credit unions have essentially the same practical effect as the checking account system engaged in by commercial banks, this similarity of effect cannot override the legal distinction in the two programs. In legal effect a share draft is nothing more than another method of withdrawal of savings from a credit union by a member, albeit a sophisticated method and one which, by its very sophistication, is new to the credit union industry.
The recommended order concludes:
Until such time as the Department of Banking and Finance, in the exercise of its regulatory authority, properly determines by rule that share draft programs are not deemed necessary or requisite to carry on effectively the business for which credit unions are incorporated, the share draft programs of the Petitioner credit unions are allowed by law ...
The Department's final order discussed pro and con the history and policy of permitting credit unions to honor members' withdrawals by means of drafts similar in form and effect to checks written on commercial banks. The Department acknowledged that the ability to permit withdrawals is one of a credit union's necessary powers *890 and that "there are no departmental rules which either permit withdrawals or restrict such activity in any way." But, disagreeing with the hearing officer, the Department found that Section 657.04(8) does not allow credit unions to exercise an incidental power except "pursuant to rules of the department," and stated:
The absence of rules on withdrawals should ... more properly be interpreted to prohibit any form of withdrawals, other than those well established by tradition and in common usage prior to 1975, unless "pursuant" to rules of the department.
For purposes of maintaining administrative and regulatory control, this department cannot abide by a policy which requires prohibitive rulemaking to restrain a credit union's action. An agency forced to adopt prohibitive or restrictive rules after the fact will soon find itself at least one step behind the industry it regulates... .
The Department's final order commented ambiguously on the hearing officer's conclusion that credit unions are free, under existing statutes and rules, to permit withdrawals in any way necessary and incidental to their business:
This conclusion cannot be totally accepted. The power or authority must be "granted" to the credit unions and absent such a specific grant, at least pursuant to a credit union's incidental powers, it is unlikely that any person or institution can offer those services traditionally thought of as the business of banking. [Emphasis added.]
The Department's final order thus seems to serve notice on credit unions throughout the state that share drafts are prohibited, but the order permits these four credit unions to continue share draft programs as an indeterminate experiment, which the Department states will provide information "on which the 1978 Legislature may base its evaluation of the program." The record shows that the Department expected similar action on the issue from the 1977 Legislature. None was forthcoming.
We agree with the hearing officer that nothing in Chapter 657 or in Section 659.52 requires credit unions to employ particular methods of permitting withdrawals from members' accounts, and that nothing in those statutes forbids share drafts of the character described in this record. If Department rules were necessary to permit particular withdrawal methods, as suggested by the Department, it would seem to follow that no withdrawals are permitted. There are no rules, either permissive or restrictive. We do not agree with the Department's view that Section 657.04(8) prohibits a credit union from employing a particular method as necessary and requisite to pay out members' deposits unless specifically authorized by a Department rule or a statute. The statute contains no such broad proscriptive purpose, nor any intent to preserve practices "well established by tradition and in common usage prior to 1975." We conclude, therefore, that credit unions which are not forbidden to do so by their own bylaws may lawfully honor their members' drafts on funds in their share accounts.
We do not doubt that the policy questions on this issue are complex, that the issue is one of importance to both credit unions and commercial banks, and that a policy decision is necessary and desirable. The Department's order before us does not make the policy choice. It is beyond our power to make that choice for the Department. General Development Corp. v. Division of State Planning, Dep't of Administration, 353 So.2d 1199, 1210 (Fla. 1st DCA 1977). It seems perfectly clear that rulemaking is the proper method of uniform policymaking in this matter of state-wide concern. We are nor persuaded that the Department will be embarrassed by the need to anticipate and proscribe undesirable practices which do not yet exist. To the extent that Chapters 657 and 659 reflect a purpose to confine commercial banks and credit unions to distinct financial roles, the Department may by rules define appropriate practices for credit unions and prohibit all others. Section 120.52(14), Florida Statutes *891 (1977); McDonald v. Dep't of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977); Florida Home Builders Ass'n v. Division of Labor, Bureau of Apprenticeship, Florida Dep't of Commerce, 355 So.2d 1245, 1247 (Fla. 1st DCA 1978), and cases there cited.
Insofar as the Department's order directed two of the party credit unions to "amend their respective bylaws to clearly allow for the method of payment used by each credit union to reimburse the payable-through banks for disbursements made on share drafts," the order is AFFIRMED. The order is otherwise VACATED.
BOYER, Acting C.J., and BLACK, SUSAN, Associate Judge, concur.