**IOWA CREDIT UNION LEAGUE and John Deere Employees Credit Union of Waterloo, Iowa, Petitioners-Appellees,**

v.

**IOWA DEPARTMENT OF BANKING, Respondent-Appellant,**

**Iowa Bankers Association, Intervenor-Appellant.**

No. 60827.

Supreme Court of Iowa.

June 28, 1978.

Richard C. Turner, Atty. Gen., and Elizabeth A. Nolan, Asst. Atty. Gen., for appellant Dept. of Banking.

Thomas, Schoenthal, Davis, Hockenberg & Wine by A. Arthur Davis and John A. Templer, Jr., Des Moines, for appellant Bankers Ass'n.

Hansen, Wheatcraft & McClintock by Ronald A. Riley, Des Moines, and Ralph S. Swoboda, Madison, Wis., for appellees.

Stewart, Wimer & Bump by Richard W. Berglund and Langley, Dunn, Mountain & Sellers, Des Moines, for Iowa Independent Bankers, amicus curiae.

UHLENHOPP, Justice.

In this appeal we must decide whether Iowa law authorizes credit unions to engage in the share-draft business.

I. The evidence discloses that credit unions constitute an extension of the cooperative movement into the saving-borrowing area. An idea was conceived to create nonprofit organizations consisting of members who were employees of a plant or business, residents of a vicinity, or other defined group. The member-savers could place funds with the organization and the member-borrowers could thereupon borrow at reasonable interest rates, to the benefit of both groups. Thus the credit unions came into being.

The primary purposes of credit unions are to receive funds of members and to lend

funds to members. These basic functions are stated in the first and second of the original and present powers of credit unions listed in § 533.4 of the Iowa Code, stating that a credit union shall have power to:

1. Receive the savings of its members either as payment on shares or as deposits, including the right to conduct Christmas clubs, vacation clubs, and other such thrift organizations within the membership.

2. Make loans to members for provident or productive purposes.

(The other five of the seven original powers were to make loans to cooperative societies, to make deposits in banks, building and loan associations, and other credit unions, to invest in certain securities, to borrow under certain restrictions, and to assess fines against members.)

During the forepart of this century the credit union movement spread across the country in the form of state statutes authorizing such organizations. The Iowa legislature adopted such a statute in 1925 in chapter 176 of the Acts of the 41st General Assembly. In broad outlines the statute remains the same as then. Code 1977, ch. 533 (our references will be to that Code). Section 533.1 states the definition and purposes of a credit union thus:

A credit union is hereby defined as a co-operative, nonprofit association, incorporated in accordance with the provisions of this chapter for the purpose of creating a source of credit at a fair and reasonable rate of interest, of encouraging habits of thrift among its members and of providing the opportunity for people to use and control their savings for their mutual benefit.

The membership of Iowa credit unions consists of the incorporators and also persons within the eligible group who are elected to membership, subscribe for at least one share, and pay the membership fee if any. § 533.5. Each member has one vote in credit union affairs. § 533.7. Some Iowa credit unions are small and are operated by part-time employees; some are large.

While credit unions have remained basically the same in principle, their functions have expanded to the present 18 statutory powers enumerated in § 533.4.

When a person obtains a qualifying membership share, he may place additional funds in "shares" or in "deposits". § 533.4(1). Shares may be of different classes. § 533.1(1)(c). Apparently shares place members in a position akin to that of stockholders, while deposits place members in a position similar to creditors. § 533.22(1)(c) and (d).

A. From an economics standpoint, the appeal involves competition for funds by credit unions and banks. We have no concern of course with advancing the fortunes of one of these types of financial institutions over the other. The legislature authorized establishment of both of such types of institutions. Our sole concern is to construe the organic act authorizing credit unions to determine whether it contemplates that they may engage in the share-draft business. The act does not do so expressly.

Specifically, the appeal does not involve the first basic function of credit unions: receiving members' funds. Nor does it involve the second basic function: lending those funds to members. Rather, according to the credit unions' contention the appeal involves an aspect of the credit unions' function of repurchasing part of the shares of their members.

Strangely, although the credit union statute spells out 18 powers of credit unions it nowhere states that as a matter of ongoing business credit unions may repurchase some of a member's shares or repay some of his deposits. The founders of the cooperative credit union movement evidently did not visualize credit unions as "in and out" financial institutions like banks, but rather as less liquid organizations having little account activity on the savers' side; apparently the thought was that member-savers would place their funds with their credit unions for periods of time, to be lent to member-borrowers. This appears from the presence of statutory provision for removal

of funds only in one situation: termination of membership. Section 533.19, which is similar to § 19 of the original act, bears the title "EXPULSION—WITHDRAWAL", placed there by the legislature itself. The section provides:

A member may be expelled by a majority vote of the board of directors at a regular or special meeting of the board. The expelled member may request a hearing before the membership of the credit union. A meeting of the membership shall be held within sixty days of the member's request. The membership may, by majority vote at the membership meeting, reinstate the expelled member upon terms and conditions prescribed by it. Any member may withdraw from the credit union at any time but notice of withdrawal may be required. All amounts paid on shares or as deposits of an expelled or withdrawing member, with any dividends or interest accredited thereto, to the date thereof, shall, as funds become available and after deducting all amounts due from the member to the credit union, be paid to him. The credit union may require sixty days' notice of intention to withdraw shares and thirty days' notice of intention to withdraw deposits. Withdrawing or expelled members shall have no further rights in

the credit union but are not by such expulsion or withdrawal, released from any remaining liability to the credit union.

Situations inevitably arose in which a member desired to have some of his savings but did not wish to withdraw from membership. While the statute did not expressly authorize credit unions to repurchase part of a member's shares or repay all or part of his deposits except in the expulsion-withdrawal situation, credit unions actually did so, perhaps purporting to act under power 11 of § 533.4 which was added by amendment in 1947 as § 6 of the Acts of the 52nd General Assembly: a credit union shall have power to

11. Exercise such incidental powers as may be necessary or requisite to enable it to carry on effectively the business for which it is incorporated.

In any event, today no one questions the authority of credit unions to repurchase some of a member's shares or to repay all or some of his deposited funds.

More recently some credit unions have launched into a new business activity—share drafts. They base their authority on an expansion of the credit unions' practice of repurchasing some of a member's shares. A typical share-draft form is appended.

The credit unions contend this new share-draft activity resulted from developing programs for direct deposit in one depository of payments to a person by a governmental unit or employer. If the depository account is a checking account in a bank, the account owner may then check out those funds to creditors such as merchants—or may indeed have the bank directly pay creditors such as public utilities. Credit unions contend that

if they cannot engage in third-party business—transfer members' funds from shares or deposits to third persons—they are at a competitive disadvantage in acquiring direct deposit business.

The record indicates, however, that direct deposit programs constitute but one of a number of improved services by the various financial institutions in the competitive struggle for funds. The credit unions in response have themselves developed improved services. The major one they wish to undertake today is the share-draft business. The problem in Iowa is that they did not obtain prior statutory authorization. Therein lies the issue: is an amendment to their statutory powers necessary?

B. The record shows that the share-draft business possesses two main distinguishing characteristics from the present mode of removal of funds by members of credit unions. One is that it brings third persons into the process. While the credit unions cite instances in which they have paid removed funds to a third person at a member's request, the whole removal process until share drafts has been largely one between the member and the credit union, frequently by passbook.

A second distinguishing feature is the "business" character of share-draft activity. Heretofore removal of funds has been largely a matter of individual transactions, whereas the share-draft business is a continuous activity. The credit unions cite the ninth enumerated power in § 533.4, that unions may make contracts. Under the contract power the credit unions contend that a member who intends to enter into a transaction involving payment to a third person may make a prior arrangement with his credit union to pay a draft which he draws on the credit union and delivers to the third person, and the credit union may lawfully pay the draft as a repurchase of part of the member's shares or even under a loan simultaneously made to him. We need not pass upon the authority of a union to engage in such an *individual* act. The share-draft activity is an ongoing *business* of third-party payments, just as the check

activity of banks is a business function in itself. Indeed the share-draft business looms so large in the activities of some credit unions that it is not a mere incident of removal of members' funds; it is a major activity in itself.

C. The share-draft business functions in the following way. A person becomes a member of a credit union. The credit union and member enter into a contract for establishment of a share-draft account, and the member buys share-draft account shares. In the contract the parties agree that the member may remove funds—that is, the credit union will repurchase share-draft shares—by drawing "share drafts" and delivering them to third persons, in addition to the usual way of removing funds from a share account.

The share drafts have most of the incidents of ordinary bank checks both in themselves and in the way they are processed, except that in Iowa they are not payable to "order"; while they are assignable they are thus not negotiable, unless made payable to bearer. §§ 539.2, 554.3104(1)(d), 554.3111. In addition, the processing of share drafts is truncated; the discharged instrument is not returned to the member.

The shares on which share drafts are drawn are different from bank checking accounts in that dividends are paid on the balance which remains through the dividend period. Since checking accounts are demand accounts, interest cannot be paid on them by state banks. § 524.805(2) ("A state bank shall not, directly or indirectly, by any device whatsoever, pay any interest on any demand deposit.").

In the operation of the share-draft business, the credit union enters into a contract with a bank to be the "payable through" bank. In some cases this is Chase Manhattan Bank, N.A. The name of the payable-through bank appears on the share draft.

The member buys a pad of share drafts from his credit union. He draws a share draft and in so doing makes a copy for himself on carbonless paper. He delivers the draft to the payee, who ordinarily deposits it in his bank. Evidently in this

process the member is assigning part (or all) of his share-draft account to the payee. The share draft passes from the payee's bank to and through the federal reserve system to the payable-through bank. Share drafts going to Chase Manhattan contain magnetic ink characters permitting automatic processing. The payable-through bank transmits the information to a computer center which maintains the credit union's records; the draft is thus electronically presented to the credit union for payment. The payable-through bank does not present the draft itself or return it but does make a microfilm copy of it, and this "truncation" results in savings. As part of the process the credit union charges the member's share-draft account and transfers funds to the payable-through bank to cover share drafts paid. Periodically the member receives a statement of the activity in his share-draft account.

The savings from electronic presentation and truncation allow credit unions to engage in the share-draft business at this time without requiring minimum balances or charges other than for the pad of share drafts themselves.

The share-draft business has already become large business. In one month, January 1977, Chase Manhattan alone processed 41,000 share drafts from Iowa credit unions, involving $2.1 million.

D. The legality of credit unions' engaging in the check business arose in Iowa in 1953. At that time (and now) Iowa credit unions were under the governance of the Iowa superintendent of banking (the superintendent). But see 67 G.A., S.F. 137. In 1953 Assistant Attorney General Black gave the superintendent the justice department's opinion that credit unions cannot engage in the check business, as that would constitute banking and § 528.50 (now § 524.107(1)) prohibits banking by institutions other than banks. The opinion stated, "It is therefore our opinion that credit unions may not permit members thereof to write checks against the shares owned by such members or against the savings accounts of its members." Op.Iowa Atty. Gen., Dec. 11, 1953.

By 1975 the credit unions again desired to enter into business activity parallel to the check business. They could have sought an amendment to their statute, as they previously did in other instances, or they could have commenced contested proceedings for a declaratory ruling under § 17A.9 of the Iowa Administrative Procedure Act. Instead, credit union representatives met with banking department officials. At the time however the credit unions appeared to be primarily concerned about "float" time (and unrelated subjects). As a result of the meeting the superintendent requested advice from the attorney general on four questions, one of which is the question involved here. On October 22, 1975, Assistant Attorney General Nolan wrote the superintendent repeating that question:

2. Can state supervised credit unions make available to their members, plans for making withdrawals by share-draft when the plan entails the utilization of service of a New York City bank expressly chosen to provide time to create a "float", thus permitting the credit union to continue to earn interest on the money deposited with it while the draft is in transit?

The Assistant Attorney General then answered the question:

II. A credit union may make available to its members withdrawal slips in the form of share-drafts which may be treated by the general public as non-negotiable third-party paper.

However, I find no authority for the credit union to deliberately create a float even under the broad language of § 533.-4(11), authorizing credit unions to "exercise such incidental powers as may be necessary or requisite to enable it to carry on effectively the business for which it is incorporated". The stated purpose of credit unions is set out in § 533.1:

"A credit union is hereby defined as a co-operative, nonprofit association, incorporated in accordance with the provisions of this chapter for the purpose of creat-

ing a source of credit at a fair and reasonable rate of interest, of encouraging habits of thrift among its members and of providing the opportunity for people to use and control their savings for their mutual benefit." 1976 Op.Iowa Atty. Gen. 299, 300.

On November 11, 1975, the superintendent questioned the part of the opinion that credit unions possess authority to issue withdrawal slips in the form of share drafts. He stated, "It is my belief that if basic changes in structure and powers of financial institutions in Iowa are to be effected, then those basic changes should result from legislative determination and action."

Assistant Attorney General Nolan responded on January 5, 1976, referring inter alia to § 533.19 which we have previously quoted. That section deals with expulsion or withdrawal from the credit unions and permits the credit union to require notice for 60 days if the withdrawal is of shares and for 30 days if the withdrawal is of deposits. After quoting portions of the superintendent's letter the assistant attorney general stated:

> Code Section 533.4 provides that a credit union shall have power to receive the savings of its members either as payment on shares or as deposits. Assuming that each member in the credit union subscribes to at least one share having a par value of not exceeding $25.00, such member is entitled to withdraw his share in accordance with the provisions of the by-laws and Code Section 533.19 upon giving the proper notice to the credit union. The credit union may require sixty days' notice of the intention to withdraw shares or it may provide withdrawal slips in the form of share drafts and thereby waive the notice requirement.

> A "share draft" as its name clearly implies, cannot be used by a member to make a demand withdrawal from his savings in the credit union account which are classified as deposits rather than shares. However, the statute does not prohibit a member from purchasing more than one share in the credit union and consequently, it would appear that a member could convert savings deposits to shares and utilize a share draft for the withdrawal of such shares from the credit union.

> Under § 533.19, any credit union member may withdraw his deposits from the credit union by notifying the credit union of his intention to do so and the credit union may require thirty days' notice of the intention to withdraw deposits. Accordingly, such deposits are not payable "on demand" and further are not subject to withdrawal by assignment or "share draft".

> Accordingly, it is the view of this office that the authorization of share drafts does not automatically convert deposits to share purchases or share purchases to demand deposits. To be a member in a credit union, a person must be elected to membership and qualify by subscribing for a participating share. Not all persons (including corporate organizations) will meet the requirements for membership in a given credit union, and a member desiring to transfer his investment in such credit union cannot do it with a negotiable instrument but can make such withdrawals as are authorized by law under § 533.19, which also provides that all amounts paid on shares withdrawn shall be paid to the withdrawing member after deducting all amounts due from the member to the credit union. The credit union's lien on such shares and deposits for any sum due from a member is as spelled out in § 533.12. 1976 Op.Iowa Atty.Gen. 380, 381.

On January 22, 1976, the superintendent wrote the president of the Iowa Credit Union League. He cited the assistant attorney general's latter opinion, stated that Iowa credit unions can utilize share-draft instruments for withdrawal of funds by members, and asked the president not to imply approval of the program by the superintendent.

Thereupon the Iowa Bankers Association commenced contested proceedings before the superintendent under the Iowa Admin-

istrative Procedure Act. After hearing the superintendent held against the credit unions on the share-draft business in general but ruled in pertinent part, "Within the limitations of their articles and bylaws, state-chartered credit unions may issue share drafts for the transfer of shares from one member to another or to a person eligible for membership. Expansion of 'share draft' activity beyond that presently authorized by the credit unions' bylaws will necessitate the enactment of enabling legislation."

The Iowa Credit Union League and John Deere Employees Credit Union petitioned the district court for judicial review. The Iowa Attorney General appeared and answered on behalf of the Department of Banking and asked that the court dismiss the petition for review. The Iowa Bankers Association intervened and took a similar position.

After trial, the trial court reversed the superintendent's decision and held that Iowa credit unions may engage in the share-draft business. The department and the bankers association appealed to this court.

II. Does the share-draft business come within the purview of present chapter 533? While that chapter does not expressly authorize the share-draft business, the credit unions argue that such business is not really a separate activity but is merely a new way for members to remove their funds, hence "incidental" to a present function. Certainly credit unions and other financial institutions should not be forever frozen into the original modes of performing their basic functions. They should be permitted to innovate and to develop new techniques so as to be able to advance their service and the public interest. Courts should encourage such progressive steps.

At the same time, however, courts must have an eye to the statute to see that the particular financial institution—bank, savings and loan association, or, here, credit union—remains within its organic act. In the present situation the credit unions must rely on the incidental powers clause—

"[e]xercise such incidental powers as may be necessary or requisite to enable it to carry on effectively the business for which it is incorporated." In engaging in the share-draft business, are credit unions merely performing an existing basic function in a different way, or are they really engaging in a new activity not contemplated by chapter 533?

In resolving this issue we are influenced by several considerations. One is that financial institutions, such as credit unions and banks, are organizations of *enumerated* powers. Since the operation of financial institutions is fraught with hazards to the public, such institutions have only the authority they are given. They cannot operate on the basis that they can proceed with a new function unless it is forbidden; they must show that it is within the intendment of their statute—either granted by the statute in express terms or necessary or requisite to a granted power. See § 533.4(11); *Dewey Column & Monumental Works v. Ryan*, 206 Iowa 1100, 221 N.W. 800; *Henderson v. Farmers Savings Bank*, 199 Iowa 496, 202 N.W. 259; *California National Bank v. Kennedy*, 167 U.S. 362, 17 S.Ct. 831, 42 L.Ed. 198; *Huntington v. National Savings-Bank*, 96 U.S. 388, 24 L.Ed. 777; *State Dep't Fed. Credit Union v. Folsom*, 99 U.S.App.D.C. 182, 238 F.2d 258; *Investment Co. Institute v. Camp*, 274 F.Supp. 624 (D.D.C.), rev'd on other grounds sub nom. *National Ass'n of Security Dealers v. SEC*, 136 U.S.App.D.C. 241, 420 F.2d 83, rev'd on other grounds sub nom. *Investment Co. Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367; *White v. Wogaman*, 47 Ariz. 195, 54 P.2d 793; *Thrift, Inc. v. State Bank & Trust Co.*, 298 Ill.App. 501, 19 N.E.2d 126; *Smith v. Bath Ln. & Bldg. Ass'n*, 126 Me. 59, 136 A. 284; *Ehrhart v. Preferred Bldg. & Ln. Ass'n*, 157 Md. 40, 145 A. 202; *New York State Bankers Ass'n v. Albright*, 38 N.Y.2d 430, 343 N.E.2d 735; 1 Michie, Banks & Banking, § 1 at 5 (Perm.Ed.); 9 C.J.S. Banks & Banking § 157 at 334–335.

Another influential consideration in the case of Iowa credit unions is that in the

past, legislative amendments were obtained to authorize additional functions which arose. Initially the statute enumerated seven powers. 41 G.A. ch. 176, § 4. By amendment the list has been expanded to 18. §.533.4. Amendments thought necessary through the years were those granting power to sue and be sued, make contracts, purchase, hold, and dispose of property, exercise incidental powers, procure federal credit union insurance, serve an employee group of insufficient number to form a credit union, deposit funds in new credit unions, acquire obligations of members, deal in obligations for certain types of loans, hold shares of corporations engaged in computer record-keeping, and engage in transactions by electronic transmission provided the transactions themselves are permitted by chapter 533 and applicable law—bringing § 533.4 to its present form. At present additional powers are pending. 67 G.A., S.F. 137, §§ 23–25. Yet an amendment has not been obtained for the share-draft business under present consideration, a business activity of enormous potential proportions compared with the activities involved in some of the amendments which were thought necessary.

Probably the most important consideration in our examination of chapter 533 is the financial implication for the public which accompanies the share-draft business. Share drafts like ordinary checks are demand instruments. The evidence shows that this means the accounts on which they are drawn are volatile. Moreover, while shares of and deposits in credit unions are traditionally bilateral between the union and the member, share drafts bring into the picture the public which will receive the drafts. In the case of bank checks, account volatility has meant that the legislature has found cash reserves against the accounts to be necessary—"sterile funds." § 524.816. And since checks pass to the public, in chapter 524 the legislature has hedged the banks about with numerous regulations to assure the public against illiquid or insolvent banks whose checks pass among the public, even to the point of restricting bank charters to the number the area can support,

§ 524.305(3), and of prohibiting interest on such accounts. § 524.805(2).

The very presence of statutory public safeguards imposed on the institutions which now engage in the check business, the banks, raises the question whether the legislature would not have imposed corresponding public safeguards on credit unions had it intended them to engage in the share-draft or de facto check business. Furthermore, if the truth is the legislature did not contemplate in present chapter 533 that credit unions could engage in the share-draft business, before it amends the chapter and authorizes credit unions to do so it may desire to impose safeguards for public protection against want of financial liquidity—for share drafts like checks will pass like money. Thus the legislature may desire to consider whether cash reserve requirements are needed on these volatile accounts, whether a minimum size on the credit union involved should be imposed, whether dividends may safely be paid on credit union share-draft accounts, and whether share-draft accounts should clearly be made demand deposit accounts in order to eliminate the antinomy of demand share drafts against accounts on which advance notice for removal of funds can be required—to suggest a few of the policy issues which the legislature may wish to resolve. Cf. 12 C.F.R. § 701.34 at 42 Fed.Reg. 61984 (enumerating a number of safeguards on share-draft activities by federal credit unions). Indeed, if the legislature finds the share-draft business by credit unions advisable, it may desire simply to wipe away the illusion that share drafts are not checks, for practical purposes. It may wish to launch the credit unions into the check business forthrightly, with demand deposit accounts so that payees are actually getting the demand instruments they think they are, with the enterprise hedged about with protections for the public, and with such refinements as appear consistent with the public interest.

These considerations lead us to believe that the share-draft business is more a new venture than a mere "incident" of existing

credit-union functions contemplated by the present statute. In sum, it is a function which, if it is to be permitted, requires legislative enactment. We reach this decision independently of the similar conclusion of the superintendent, as the meaning of the statute is ultimately for our determination. *West Des Moines Education Ass'n v. PERB,* 266 N.W.2d 118 (Iowa). We are aware of but respectfully decline to follow *American Bankers Ass'n v. Connell,* 447 F.Supp. 296, (D.D.C.) and *Florida Bankers Ass'n v. Leon County Teachers Credit Union,* 359 So.2d 886 (Fla.App.)

We intimate no opinion, of course, on whether credit unions should be authorized to engage in the share-draft business as a matter of economic policy. That is not a judicial question, nor is the judiciary equipped to make the investigation necessary to resolve such a policy issue.

Based on chapter 533 we overturn the judgment of the district court and reinstate the decision of the superintendent.

REVERSED.

All Justices concur.